IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JAMES HUEBNER,

    Plaintiff,

v.                                        No. CIV-01-1238 WJ/LCS

CITY OF ROSWELL, et al.,

    Defendants.

## MEMORANDUM OPINION AND ORDER
## ON THE ISSUE OF DAMAGES

THIS MATTER comes before the Court pursuant to Plaintiff's Motion for Default Judgment [Docket No. 8] with regard to Plaintiff's 42 U.S.C. Section 1983 and state law claims. The Clerk of Court entered default in this case on March 18, 2002 [Docket No. 9]. The Court entered default judgment on the issue of liability on April 25, 2002 [Docket No. 11]. An evidentiary hearing on damages was held on October 17, 2002.[1] Since Defendants failed to enter an appearance, file an answer, or otherwise defend in this case, they were not entitled to notice of the hearing. For the reasons below, I find that Plaintiff is entitled to damages in the amounts specified.

**FACTUAL FINDINGS**

Plaintiff was employed by the City of Roswell as a police officer for the Roswell Police Department. At the time Plaintiff's employment ended on May 22, 2000, he had been employed

---

[1] For purposes of the hearing on damages, this case was consolidated with CIV 01-1238 WJ/LCS.

for about sixteen years and would have been eligible for retirement in four years.  In December 1999, Plaintiff, a sergeant, was assigned as a computer administrator.  In this position, he had supervisory responsibility over Department dispatchers.  Plaintiff's position as a supervisor for dispatch was a daytime position.  At some point, Plaintiff began a relationship with one of the female dispatchers, Mrs. Payton-Huebner.[2]  In March 2000, Plaintiff moved in with Mrs. Payton-Huebner.  The nepotism policy in effect at the time stated:

> In the event that two employees are in position of direct or indirect supervision through any departmental chain of command and/or are in positions in the Fire or Police Departments where their job duties may require them to be in communication with each other during an emergency response situation, and these two employees establish a relationship  . . . through life-style accommodations being the substantial equivalent of a family relationship, then one of the employees shall remove himself to another position which is not under direct or indirect supervision of the other, subject to the approval of the City Manager.  Such transfer shall occur within fourteen (14) calendar days of the change in relationship.  Should neither of the individuals volunteer for transfer, the employee with the least amount of full-time, continuous service with the city shall be transferred by management, if a position is available, or laid off, if no vacancy is available for which the individual is qualified.

City of Roswell Personnel Rules and Regulations, Chapter IV § 420.0(C), admitted as Exhibit 3 at the hearing on damages.

Mrs. Payton-Huebner notified the Department of her relationship with Plaintiff and volunteered for a transfer in accordance with the city policy on nepotism.  Between Plaintiff and Mrs. Payton-Huebner, Mrs. Payton-Huebner was the employee with the least amount of full-time, continuous service with the city.  Thus, even if she had not volunteered for a transfer, she would be the employee transferred involuntarily pursuant to the policy.

---

[2]At the time the relationship started, her name was Ms. Payton.  She and Plaintiff have subsequently married.

A position for which Mrs. Payton-Huebner was qualified was available within the Police Department. The position would have removed her from any direct or indirect supervision by Plaintiff, and would have eliminated the possibility that she would have to communicate with Plaintiff during an emergency response situation. In accordance with the policy, Mrs. Payton-Huebner should have been transferred. However, her request for transfer was denied. Chief of Police Richard Campbell informed Mrs. Payton-Huebner that he was denying her request for transfer because the transfer would result in a pay cut for her and Chief Campbell did not want the Department to be sued when her relationship with Plaintiff ended.

In response to the relationship between Plaintiff and Mrs. Payton-Huebner, the Department notified Plaintiff that he had the option of ending the relationship, resigning from the Department, being fired from the Department, or accepting a transfer. Plaintiff was transferred before he had an opportunity to discuss these options with the Department or notify them of his decision. Plaintiff's transfer was not in accordance with the policy on nepotism given that Mrs. Payton-Huebner volunteered to transfer and given that Mrs. Payton-Huebner was the employee, who by the clear terms of the policy, would face a choice of transfer or layoff.

Plaintiff was transferred to a swing shift position. Both Plaintiff and Mrs. Payton-Huebner were told that Plaintiff was being transferred to make an example of him to others in the Department. Plaintiff was told that he was being transferred to the less desirable swing shift position because of his refusal to end the relationship with Plaintiff. Chief Campbell told Plaintiff that the relationship he was having with Mrs. Payton-Huebner was wrong and would not last.

In the interim between the time Mrs. Payton-Huebner requested a transfer and the time Plaintiff was transferred, Plaintiff was ordered to move from the home he then shared with Mrs.

3

Payton-Huebner. Additionally, Plaintiff and Mrs. Payton-Huebner were ordered to have no contact with one another of any kind until Plaintiff's transfer was effected. Plaintiff was locked out of the Department's computer system, was told he could not be in the radio room for any reason, was told he could not visit Mrs. Payton-Huebner in her home or allow her in his car. Plaintiff was required to get special permission to return to his home for uniforms and other essential personal items. Defendants told Plaintiff he would be watched.

After Plaintiff's transfer, he was permitted to move back into the home. However, Department supervisors began to harass Plaintiff and Mrs. Payton-Huebner. Plaintiff and Mrs. Payton-Huebner were not permitted to have contact with one another while either of them was working. Other Department employees were permitted to speak on the phone and visit with spouses, children, and friends during work hours so long as they performed their duties. During Plaintiff's sixteen years of employment, he had never before been in any trouble and had always received good evaluations. After he began his relationship with Mrs. Payton-Huebner, he became the subject of an internal investigation and the subject of police surveillance.

Between March and May of 2000, Mrs. Payton-Huebner frequently saw patrol cars near the home she shared with Plaintiff. Patrol cars would park behind the home and the officer within the car would watch the home with binoculars. Plaintiff confronted Commander Smith of the Roswell Police Department whom Mrs. Payton-Huebner had seen parked behind the house in a patrol car. Smith admitted having been parked behind the house and stated he had just wanted to see where Plaintiff lived.

According to Plaintiff, as a consequence of the harassment, including surveillance and investigation, he was forced to resign from his employment with the Department. As a result of

4

Defendant's conduct, Plaintiff suffered severe economic hardship and emotional distress. Plaintiff was forced to spend his retirement. He suffered anxiety, low self-esteem, depression, and humiliation. He also lost most of his friends. Plaintiff does not wish to return to work for the Roswell Police Department. Many of the persons involved in causing his termination are still with the Department. If Plaintiff returned to work at the Department, he would face a hostile work environment and would experience ongoing humiliation and possibly harassment.

M. Brian McDonald, Ph.D. was admitted as an expert at the hearing on damages. His report was admitted as Exhibit 2. His testimony and his report indicate that, at the time of Plaintiff's termination from his employment with the Department, his base hourly rate was $17.325 per hour. Plaintiff also worked overtime and was paid for these overtime hours. Plaintiff received longevity pay of $34.65 per pay period. In 1999, Plaintiff had W-2 Medicare wages of $40,400.56. Based upon his payroll stub ending June 9, 2000, he had earned $16,353.33 through May 22, 2000. On an annualized basis, his 2000 wages would have been $42,021. In 2001 and 2002, Plaintiff would have received salary increases equal to the national average increase in wages which was 4.1% in 2001 and 3.5% in 2002. For the years from 2002 until his retirement, Plaintiff's wages would have increased 3.5% per year. The value of non-pension, employer-paid fringe benefits is estimated at 17.81% of annual salary which is a national average fringe benefit rate for non-pension fringes based on the March 2001 Employment Cost Trends of the U.S. Bureau of Labor Statistics.

Plaintiff would have worked for the City of Roswell until October 31, 2007 after 22.85 years of service. He would then have retired and been entitled to 80% of his final average salary in PERA benefits. The final average salary is equal to the average of the highest consecutive 36

months of earnings and includes base pay and longevity pay, but does not include overtime pay. As of May 22, 2002, Plaintiff's base pay plus longevity pay was $36, 937. With a 3.5% increase per year, Plaintiff's base pay plus longevity pay would have ben $47,267 in 2007. His final average salary as of October 31, 2007 would have been $45,686. PERA retirement has a cost of living adjustment of 3.0% per year payable as of July 1st after two full calendar years of retirement. James Huebner was born on October 8, 1959 and has a normal life expectancy of 76 years based on the 1995 life table of the National Center for Health Statistics. In calculating future lost PERA benefits, these were discounted to present value using a 4.5% interest rate which is the current yield on long-term U.S. government bonds. In calculating front pay, present value was accounted for at the same time that growth in future values was calculated using a factor equal to .9685. This calculation is explained more fully in the expert's report, admitted as Exhibit 2 at the hearing.

**LEGAL CONCLUSIONS**

Because default judgment was entered for Plaintiff on the issue of liability, the damages determination in this case is premised on the assumption that each of Plaintiff's allegations of fact are true, and each of his claims is established as a matter of law. Thomson v. Wooster, 114 U.S. 104 (1885); In re The Home Restaurants, Inc., 285 F.3d 111, 114 (1st Cir. 2002). Mitigation is an affirmative defense. Because Defendants did not appear to defend this action and did not assert the defense of mitigation, the damages awards do not take into account any failure of Plaintiff to mitigate his damages. Plaintiff's requested relief includes backpay, frontpay, and the value of his lost PERA benefits. Additionally, Plaintiff seeks compensatory damages for emotional distress. Damages under Section 1983 serve both a remedial and deterrent purpose.

McGhee v. Draper, 639 F2d 639, 644 (10th Cir. 1981). This Court is empowered to fashion an appropriate remedy including compensatory and equitable relief. Id. I find that an appropriate remedy is one that will make Plaintiff whole and place him in the position he would have been in but for the conduct of Defendants.

I.      PLAINTIFF'S REQUEST FOR BACKPAY

Plaintiff's request for backpay damages may be awarded pursuant to 42 U.S.C. § 1983. See McGhee, 639 F2d at 646. He is also entitled to these damages pursuant to the other claims in his complaint. I find that Plaintiff suffered economic losses as the result of the termination of his employment. Thus, he is entitled to an award of backpay for those losses. The award includes his lost wages and lost non-pension fringe benefits. Based on the above findings, the testimony of Plaintiff's expert at the hearing on damages, and the calculations in the report by Plaintiff's expert, admitted as Exhibit 2 at the hearing, I find that Plaintiff's backpay award for the year 2000 is $30,239, for 2001 is $51,535, and for 2002 is $53,339. Thus, Plaintiff's total backpay award is $135,113.[3]

II.     FRONTPAY

Plaintiff requests frontpay damages until his projected retirement date of October 31, 2007. I find that reinstatement is not an available remedy in this case because the facts presented by Plaintiff indicate that he would be subject to a hostile work environment if he were to return to work at the City of Roswell Police Department, and a productive working relationship would be impossible.

---

[3]This figure differs from the calculations of Plaintiff's expert in that the expert calculated damages through October 31, 2002, and this judgment was entered in December 2002. Thus, the backpay award was increased by $8890 and frontpay was decreased by the same amount.

While a frontpay award for the time period requested by Plaintiff is unusual, it is not wholly unprecedented. In <u>Fitzgerald v. Sirloin Stockade, Inc.</u>, 624 F.2d 945, 957-58 (10th Cir. 1980), the Tenth Circuit affirmed an award of frontpay for five years and stated that the award was neither unreasonable nor speculative. I find that under the unique circumstances of this case, it is reasonable to believe that Plaintiff, a police officer with the Roswell Police Department for nearly sixteen years and only four years from being eligible for retirement at the time his employment ended, would have continued to work for the Department until his retirement. I also find that nothing short of front pay until Plaintiff's projected date of retirement will make Plaintiff whole. Thus, I find that Plaintiff is entitled to an award of front pay from the date of judgment until October 31, 2007. Based on the above findings, the testimony of Plaintiff and Plaintiff's expert at the hearing on damages, and the calculations in the expert report, admitted at the hearing as Exhibit 2, Plaintiff is awarded frontpay of $234,948.[4]

## III. LOST PERA RETIREMENT BENEFITS

Lost retirement benefits is an appropriate remedy to make Plaintiff whole in a Section 1983 action. See <u>Spiering v. City of Madison</u>, 863 F.Supp. 1065 (D.S.D. 1994). It is also an appropriate remedy pursuant to the other claims in Plaintiff's complaint. As noted above, Plaintiff was only four years from retirement eligibility at the time his employment ended. It is reasonable, given the particular facts of this case, to believe that Plaintiff would have worked for the Department until retirement. Thus, I find that Plaintiff is entitled to an award for his lost PERA benefits. It is also reasonable to believe that Plaintiff would have worked for the Department until

---

[4]The Court might have considered awarding frontpay only until Plaintiff reached his eligibility for retirement. However, the only evidence presented was Plaintiff's representation that he would have worked until he had 22.85 years of service.

he had maximized his retirement benefit. Therefore, I find that Plaintiff is entitled to an award as calculated in the expert's report, admitted as Exhibit 2 at the hearing, and as testified to by the expert at the hearing on damages. Plaintiff is awarded lost PERA benefits in the amount of $528,957.[5]

IV.     PLAINTIFF'S REQUEST FOR COMPENSATORY DAMAGES

Plaintiff's request for compensatory damages may be awarded pursuant 42 U.S.C. § 1983 and pursuant to the other claims in his complaint. I find, based on the allegations in Plaintiff's complaint and his testimony at the hearing, that Plaintiff is entitled to compensatory damages in the amount of $25,000.

**CONCLUSION**

IT IS THEREFORE ORDERED that Plaintiff is awarded $135,113 in backpay.

IT IS FURTHER ORDERED that Plaintiff is awarded $234,948 in frontpay.

IT IS ALSO ORDERED that Plaintiff is awarded $528,957 in lost PERA retirement benefits.

IT IS FINALLY ORDERED that Plaintiff is awarded $25,000 in compensatory damages.

_____
UNITED STATES DISTRICT JUDGE

---

[5] The Court might have considered calculating the retirement benefits based on an earlier retirement date that included twenty years of service. However, the only evidence before the Court is Plaintiff's representation that he would have worked until he had 22.85 years of service and would have thus maximized his retirement benefit.